We'll begin with you. Burl Cain v. Kevin Brumfield. Primala Burns. Is it supposed to be Pamela? Okay. May it please the Court, Your Honors. Primala Burns on behalf of the 19th Judicial District for the State of Louisiana, representing Appellant Warden Burl Cain. This matter is United States Supreme Court for this court to review the factual finding by the Middle District of Louisiana that Kevin Brumfield is intellectually disabled and therefore exempt from capital punishment as fixed by a Louisiana jury on July the 3rd of 1995. Our initial presentation and appeal to this court was predicated on a dual-fold issue, that of similarly a request that the finding of the district court be reviewed and reversed. While the opinion of this court focused on the issue of epidefference, the court likewise noted in footnote 8 that even if it were to consider the newly presented evidence in federal court, we would likely hold that Brumfield had failed to establish an Atkins claim. Although the most current brief of Mr. Brumfield appears to suggest that in some matter the majority opinion of SCOTUS made some type of preliminary finding of intellectual disability, I suggest to the court that the holding was simply that there was error in not holding a state Atkins hearing, nothing more. There has been no finding at all as to the issue of intellectual intellectual disability. They are two separate and distinct issues as noticed by Justice Breyer during his colloquy during the oral arguments in which he stated, Ms. Burns, if I had to rule right now on these issues, I would say that as to the hearing, you lose, as to intellectual disability, you win. These are in fact two separate issues. The bottom line of this court's inquiry is whether or not Kevin Brumfield was capable on a daily basis of coping with the demands of life in his community without the necessity of a structured support system. I take it that the bottom line for this court is whether the district court was clearly erroneous in its fact finding that he was intellectually disabled or is, I guess, present tense. It was his burden of proof to prove by a preponderance of the evidence that he was intellectually disabled, which we say he failed to do. It appeared in the opinion of the court that we had some type of burden, that we had some type of burden to come forward and to say, well, you know, I find that a 10-year-old could do this. Therefore, the state, you need to come back and do this. We have no burden going into that hearing. There was a burden on the defendant by a preponderance of the evidence to show that both as to intellectual functioning, which is IQ, which is a number range, which is largely discarded by the courts because we hang our hats, and the jurisprudence says that you hang your hat largely on the adaptive functioning because that is a subjective area. It is the most determinative area, not simply an IQ range, which is not dispositive of anything. And in that adaptive functioning, what is required to be looked at is the case law. The court has got to be guided in how it conducts an Atkins examination. What are the factors that the case law says that are to be looked at, not just clinical determinations by experts, which we feel was what the court basically hung its hat on during this Atkins hearing, not just those clinical conclusions, which are aids to the court. Is that your, to follow up on Judge King's question, is that your position of clear error because your brief doesn't really discuss the standard of review for clear? Our position, Your Honor, is simply that they have not met the burden under law, which clearly says in all of the cases, whether they're on habeas, on direct review to the court, that it is his burden in doing so. On which issue? On burden of proof. You said there were two issues in this case. There are. There are. So which issue is clearly erroneous? It is clearly the finding that he prevailed by the preponderance of evidence is clearly erroneous. And, Your Honor, further, we feel that the court, first of all, did not, was not conversant with the case law in how to conduct an Atkins review. The court, on approximately the third day through the hearing, was not aware of the case law of the state of Louisiana. And I would start with Manning, with Dunn III, with the Derrick Todd Lee case, with the Shedron Williams case, with Maldonado, with, that took in Vercino for standards. That's the standards not just of Louisiana, but of the Fifth Circuit as well. And lastly, as has been formulated in Hall v. Florida, and most recently by this court in the Henderson decision, there are a variety of things. The court, by not being conversant with the case law, cut off the introduction of the trial record. He cut off, as well, by motion in limine in advance of trial, the production of things such as prison witnesses that would testify as to the defendant's adaptive behavior in prison. He felt that none of these things were relevant to the issue of adaptive functioning. He felt the fact that, although he opined in his opinion, which is ironic, I would proffer to the court, he opined that we don't know who the leader of this crime was. It may have been the other fellow. Very clearly, that record showed that there was one leader in this case, and it was done by both expert testimony, the facts of this case, and the defendant's own words, his confession in this case, his two confessions. It was done by his testimony during the motion to suppress. It was done during his outburst to the court on October 23rd of 2005 at the post-conviction hearing, in which, when he realized he was being ruled against. Are you arguing that the court abused his discretion in some of these things that you say in the proceedings, or are you just putting those in for flavor or something? Not at all. I don't see this as points you raise in your brief, specifically. Not at all. Three times during the course of the hearing, we attempted to introduce the record, and the court very clearly said, I don't, for example, I don't find that the fact that this man was in the store 77 minutes before the killing occurred to view Betty Smothers and the clerk, he said that had nothing to do with his adaptive behavior. He found that, when I tried to introduce testimony concerning the motive for the crime, which was that he needed to produce money for his pregnant girlfriend, he would not allow that testimony into the record because he considered that irrelevant. It showed motive. It showed that this was the ringleader of the crime, his motivation for it. This was not allowed. What was also not allowed was the fact that I attempted to put in the trajectory expert, the coroner's expert, and the reason— I'm sorry, but where is, I mean, are these points in your brief that you— Yeah, where is this stuff? I have to say it's been two months since I've read your brief, but this doesn't ring a bell. Is this stuff in your brief? That the court disallowed, yes, that the court disallowed the evidence of the record, which it goes to show adaptive functioning. I don't see how you can discuss whether a person is intellectually disabled or not without looking to the crime that he committed before, during, and after. The case law is replete. We repeatedly raised error with this. We raised it in our brief. But I'm sorry, I know that you do discuss that the court didn't let you get in certain evidence or whatever, but you don't raise that as an error point. You just say that if the court looked better at the evidence, it would find your way. So these are not actual points of error, legal error, are they? You don't brief them as points of legal error. The fact that the record was not allowed to be introduced, I believe, is very clear error. I don't see how any court, they have violated the law. Every one of these cases has looked at the facts of the case, has looked at prison behavior, behavior before, during, and after other crimes. He did not want to allow us to present evidence of crimes that had occurred two weeks before. The court attempted to make a purely clinical determination of intellectual disability based upon what I would submit to the court is very suspicious expert testimony by Dr. Weinstein, piggybacked by Dr. Swanson. That was the only evidence that was put forth in this case. Okay. So let me just, can we slow down for just a second, please? Are you saying, you're not saying that the court committed legal error, you're saying the court clearly erred in failing to consider certain facts when it made its factual determination. I believe it committed legal error as well because it violated the standards of both the state of law. But I don't see those as points you raise in your brief that, you know, like appellate point one is this, legal error on this. I just think the whole thing is just the court looked at the evidence wrong. Maybe you, am I wrong on that? Of course, that it did as well look at the evidence because you had what you did have of the record, certainly, which was the confessions of this defendant, the parts of the testimony that were in fact allowed into the record that showed his pre-planning, that showed his mental condition, that showed the trial testimony. And a lot of that came in the sense that at penalty phase, you had two other victims who testified, you had his family that testified, then contrary to what was eventually elicited during the AMAS interviews with Dr. Weinstein, it was totally contrary and different to that. So your focus today is on the exclusion of the record. It's not just the exclusion, Your Honor. It's also the content of the record. It's what do you prove? What has been proven in this case? What was put on was Dr. Swanson, who piggybacked her findings, her expert opinions. If you come into the court, her expert opinion was totally based on a very cursory, admittedly cursory review of the academic records only a few days before her report was due. She had never met with this defendant. She did not meet with him for 17 years, even though her report was due at that time. She entirely, she could have looked at the two confession tapes. She neglected to do so. She did not know one fact of this case. She did not review any of the penalty phase reports of Drs. Bolter, Dr. Guin, the incorporation of the testimony of Dr. Jordan. She simply based a finding, without having met this man, based on Dr. Weinstein's reports and findings, which she stated, I am presuming to be true. So is that, that reflects on her, the quality of the testimony? It's the quality of the testimony because— Her expertise, her ability to testify, or the credibility? It is more to the credibility, but the fact is, too, that she had never been accepted as an expert in court until the Atkins decision. And she was retired from her practice for 30 years. She began testifying as an expert after 30 years. Is there a Dober hearing? There was not. But do you have a legal challenge that this expert was unqualified, and therefore, their opinion should— We did during Bois d'Ire, of course. But not here, before us, that the court erred in allowing this expert? The objections would have been made in the trial, before the trial court. Right, but, so we can only review it now on credibility. And if there's some evidence in the record to support the verdict, I mean, the decision of the trial court, aren't we— Well, I would disagree. He has to prove by a preponderance of the evidence. It's not a some evidence as, you know, you would have you believe to say that, oh, he was entitled to a threshold hearing because he made an allegation that he has an IQ of 70 or 75. No, there has to be a preponderance of the evidence. And what we're saying here is that her testimony is not worthy of credibility. And more precisely, what she based her testimony on was the testimony and the report of Dr. Weinstein, who has been found and documented in the federal system to be biased, to be untruthful. And we cited to the court Jimenez Bencebe, a 2013 case in which the District Court for Puerto Rico found him to be totally unworthy of belief that he has a checkered history in Atkins cases. His history, although it was challenged repletely at trial, he attended and got a Ph.D. from a university that no longer exists, was never accredited, was never bricks and mortared. He testifies only for the defense. He had not had a clinical practice since 2002. He has a Down syndrome child. He— And what has that got to do with it? It indicated bias to us. It indicated bias. And he has, in other cases, gone in with the presumption that somebody is disqualified and disabled before even examining them. And that's basically— Now, let me ask you something, because you're a person of great courage. Did you bring that out to the District Court? I did. I did, Your Honor. I certainly did. What did the District Court rule about his disabled child? What we brought out was the fact— We brought out the other cases. I questioned him on that, and eventually the Court cut me off and said, well, you know, Ms. Burns, we've heard enough about his other cases. We felt he should not have been qualified as an expert. Yet, in the opinion, where we put on experts who testified, they're both their trial experts, Dr. Bolter, that I think is really huge in this case. I think that is the most prevalent fact, is the fact that their trial witness, who was hired and privately funded for them, the witness of their choice, along with Dr. Brian Jordan, along with Dr. Cecil Buin, none of these people for a history of 22 years found at the conclusion of this trial that there was ever the label of intellectual disability, which would be a form of mental retardation. He was in behavior disordered classes. He was never labeled as mentally disabled. He was never retained. It was not until the breakup of his family that the disruption occurred. And the records will show, even from Mississippi, that he was making all Bs and one C when he was in Mississippi, and only with the breakup of his family did this acting out behavior occur. And as the courts have found, most recently in the Henderson decision, these types of things, lack of structure in a home, the breakup of a family, an abusive home, a bad community, are not the reasons to label somebody as mentally retarded. And under the Louisiana statute as well, none of these things constitute intellectual disability. For 22 years, he was labeled as aggressive, under socialized, behavior disorder, ADHD, and later it morphed into antisocial personality disorder, even by his own doctors, which we call Dr. Bolter at the federal hearing as well. And he said, I never suspected mental retardation. I still do not suspect mental retardation. And this is a man with a bachelor's from Berkeley, University of the Pacific, University of Memphis. He is a prescribing neuropsychologist at a respected institution. And he was there and hired by the defense to flesh out any and all possibilities for a defense. And even though mental retardation as an execution bar did not exist in 1995 at the time of this trial, it was nevertheless under Louisiana law, allowed to be used as a mitigator. If the person was under the influence or domination of another human being, if because of a mental disease or defect, they could not appreciate the criminality of their act, if they were a principal whose participation was relatively minor. Was it argued in the mitigation phase? It was not, because I submit to the court, it was not there. It was argued simply that he's a behavior problem. He came out of a bad home. He does have a lower IQ, but it was an IQ that was testified to as being 75. And in this case, what you had was six psychologists, two medical doctors, who evaluated him with a whisk the waist for a juvenile as early as March the 15th of 1984, saying he was either in the low average to borderline dull, dull normal range, which could be anywhere from 70 to 75 dull normal during the course of the hearing, 80 to 89. There was never any indication that he tested in this range. And even the tests of Dr. Weinstein put him in a 72, Dr. Bolter in a 75, Dr. Hoppe in a 70. So you have to go to the adaptive behavior. And in this case, he well functioned as the leader of this crime. We know it from his confession tapes, his ability, first of all, to proffer a defensive alibi, trying to solicit it through his girlfriend, then proffering it to the police. Then when he was caught, he tried to minimize his participation, which is evidence of adaptive functioning, by lying and saying, I was the driver, not one of the two shooters. Then when he was finally cornered, his last confession tape, which is very replete, goes into great details of the crime, the streets that he took. The court can watch that and see the fluidity, the ability to plan, the ability to formulate. He admits that he planned this crime. He admits it was a complex crime where he had to scope it out and even went to the store 77 minutes before to verify that there were two vulnerable female victims there, just as he had robbed two vulnerable female victims five days before this crime and another vulnerable man on December the 25th as well. He had the ability not to be gullible, as the doctor said, as Dr. Weinstein said, but he preyed on helpless people. He was one who was able to lie to show his deficits. He was able to also, in tandem with the other shooter, this was the reason the state wanted to introduce the testimony of the coroner and the trajectory expert was to show that you had two shooters. The judge at the district level said, we don't know who did what, but if you had read that, you would know that each of these individuals worked in tandem with each other to shoot simultaneously, but also independent of each other. There was no coercion, no leading, which is a primary function of the court in finding that somebody is, in fact, intellectually disabled, that they are at the behest of another person, that they act with impulsivity as opposed to planning and premeditation in this case. I'm sorry to bother you again, to interrupt you again, I really am trying to get a prism to which to evaluate this case. Are you saying that you can establish that the district court's finding of intellectual disability is implausible in light of the record as a whole, or are you not saying that and saying, as a matter of law, he is not intellectually disabled? As a matter of law, he definitely is not. But do you concede that you cannot establish that the district court's finding is implausible in light of the record as a whole? I would disagree with that. I would say that both apply, quite honestly. So you think you can meet both of those? I do, Your Honor, with all due respect, because barring a record, leaving it out, putting weight down to someone who has been found to be dishonest in court, and in this case, I went on direct questioning by myself of Dr. Weinstein. He admitted that what was in his report, that this defendant couldn't even lay shoes, that he could never find a job, that he could never find employment, that he had poor hygiene, that he couldn't bathe, that he couldn't play sports, all of this was debunked by the ABAS in the interviews in his case. He absolutely did not, with candor, submit to the court what was in those underlying findings. And to boot, what I consider the most dishonest piece of evidence on his part was Exhibit P3 that came into the trial, which was a chart of supposedly all the IQ testing, which deliberately ignored the first WISC test in 1984 by Dr. Young, which showed him to be low average, borderline normal, dull normal, excuse me. And then it included a C-Tony and a PPVT, which Dr. Greenspan testified should never have been included there. And finally, Dr. Weinstein admitted, yeah, I shouldn't have put that one in, and I was like, but why didn't you put the other one in either? And then to, on top of that, to compound the error, he put down that it was a 54 when he knew that there was another number, a 75, yet rather than telling that to the court that there were, there's a possibility of two numbers here, he put down that it was a 54. And when we were at the Supreme Court in rebuttal argument, counsel for Mr. Brumfield argued in a final pleading, are you going to execute a man with an IQ of 54 when that record, and that witness admitted that that should never have been in there, and he didn't even know that number? What we're trying to get at here is accuracy and the truth. He did not prevail on his burden. He is presumed sane, responsible. It is up to, in an Atkins hearing, for him to come forward with evidence that is reasonable, that proves beyond a preponderance. His witnesses in this case actually, I think, wash out. Now you have the burden, either to establish as a matter of law that he fails, or to establish that the district court's determination is factually implausible. Do you agree with that? I do. And I would submit to the court that that is an implausible opinion, because everything in that opinion where the court alludes to, that it could have been the other guy, it could have been this, it could have been that, that is absolutely implausible, and had he read the record. I have never seen a case— Are you aware of any case where there's been expert testimony that the court credits that where we would say that was implausible, any case at all, in any context? I would look to the cases where they talked about Dr. Weinstein as being incredulous, checkered, and biased, and untruthful, yes. Jimenez-Benceve, citing Ortiz, Pizzuto, Maldonado, Albarone. I would like to reserve the rest of my time for— All right. We'll add this time to your five minutes. Thank you, Kim. All right. Thank you very much. Ms. Jolly. Please, the court. Your Honors, if you will, I'd like to be very clear about what was at issue and what was not at issue before the district court, because that obviously informs this court's mandate on appeal. It was undisputed before the district court that Mr. Brumfield satisfied the first prong of intellectual disability. All of the experts who testified at the hearing, including the state's experts, agreed that Mr. Brumfield has substantial limitations in intellectual functioning. The state's expert testified that Mr. Brumfield has an IQ of 70, unadjusted in any sort of way. It was also not in dispute before the district court that, to the extent Mr. Brumfield has proven his limitations, they manifested during the developmental phase. The only issue before this court is whether the district court clearly erred in finding substantial limitations in adaptive skills. And what I'd like to do, if you will, Your Honors, is take you through the objective evidence in the record which suggested such limitations and which support the district court's finding, keeping in mind, of course, that we're simply on clear error of view, and the only inquiry before this court is whether there was evidence in this record to support the district court's finding. And I submit that there's ample evidence, Your Honors. JUSTICE O'CONNOR. So were we not to consider whether, as a matter of law, he fails? MR. ZUNIGA. Your Honor, there's been no legal challenge, no as-a-matter-of-law challenge by the state here. It's conceded that the district court applied the correct standard for intellectual disability.  it was the state who put forth the standard for intellectual disability. JUSTICE O'CONNOR. Well, it says that in passing in their brief, and it seemed to be that was what was being argued today. So that's why I was asking. MR. ZUNIGA. Your Honor, to be honest, we're not quite sure what the state is arguing because they never once in their brief acknowledged the standard of review of clear error and never point to a specific clearly erroneous basis for concluding that the district court clearly erred. What we do know on this record— JUSTICE KAGAN. She said the record was implausible as a whole. MR. ZUNIGA. Right, Your Honor. And let me go to why the record wasn't implausible as a whole. And again, we're really just looking at the second prong here, which is limitations in adaptive skills. What we had was, Your Honor, undisputed evidence that Mr. Brumfield reads at a fourth-grade level. The state's own expert put him at a fourth-grade level, and the state's expert described that as this. That's simply word recognition. This is a quote. That's not even comprehension. That's just identifying words. That came out of the Supreme Court's opinion as well. That was in the state record as well. There was undisputed evidence that Mr. Brumfield writes at a fourth-grade reading level and, in fact, had a severely limited— I should say limited—motor skills. He requires a piece of cardboard, Your Honor, to write in a straight line and guide his hand along. JUSTICE KAGAN. Where did Mr. Brumfield grow up? Where did he go to grammar school? MR. ZUNIGA. He was in Baton Rouge Parish. JUSTICE KAGAN. Parish, not city? MR. ZUNIGA. I believe it was in East Baton Rouge— JUSTICE KAGAN. Okay. MR. ZUNIGA. I could be wrong about that, Your Honor. I'm not sure exactly which school system it was. But it was in Baton Rouge Parish, but I'm not sure which city. JUSTICE KAGAN. It's not terribly unusual that several Louisiana schools don't teach children to read beyond the fourth-grade level. MR. ZUNIGA. Your Honor, I take that— JUSTICE KAGAN. I don't give a lot of credence to that. MR. ZUNIGA. Well, Your Honor, you know, when—it's true that when you take any—when you isolate any limitation of someone who has intellectual disability and look at it in isolation, you can find persons who aren't intellectually disabled who have those limitations. What's key about this record is the consistency. And I'll make one other point about that, Your Honor, which is this. Not only did Mr. Brumfield have and does he continue to have a fourth-grade reading level, fourth-grade writing level, what the evidence showed in this record was that he was put in the most structured offering that Louisiana schools had to offer, which was for behavioral disordered students. And what the evidence said here—the evidence in the record here was that what you would expect in that sort of classroom is to see that there's still progression. But despite the one-on-one attention that Mr. Brumfield received from the fifth grade onwards to the ninth grade by the time he dropped out of school, he never progressed at all academically. In the ninth grade, Mr. Brumfield was tested for his problem-solving skills. He tested in the first grade nine months. What that means is that when Mr. Brumfield was 14 years old, he had the problem-solving skills of a five- or six-year-old. And so what you see—and this is the evidence in the record, this is Dr. Swanson testified to this—when you see that sort of plateau academically, that's the epitome of intellectual disability. So it's much more than simply what occurs in other people who may be illiterate. What you have here is actual evidence in the record that he received individual attention and still couldn't achieve beyond those levels and still today can't achieve beyond those levels. And in addition, Your Honor, additional limitations we have in the record beyond simply plateauing academically despite his attention and beyond, quote, needing someone to help him function, whether he was at home or at school. That was in Dr. Gwynn's report, which was in the record. All of those come from the school medical records and from the interviews that Mr. Brumfield's experts undertook with several people who knew Mr. Brumfield during the developmental phase. In addition to those limitations, you have evidence that Mr. Brumfield couldn't follow simple directions. It's again from his school records. When he was asked to follow simple directions, he seemed confused, was the quote from the school records. At the time, this is in the fifth grade. Do you agree that this could have gone either way on the second prong? Your Honor, I think it's really hard to reach that conclusion, and I'll tell you why. Mr. Brumfield put forth, again, objective evidence, and I still have more to go through, of his limitations. And essentially what the district court had before him was this. The state put forth experts in an attempt to controvert the second prong, but they didn't controvert any of the facts I've given you. They didn't show that he had a higher reading level. They didn't show that, and I'll get to some of the objective testing, neurological testing. They didn't put on an expert who was qualified to contest that testing. And they, crucially, and the district court found this, and this was found as well in this court's decision in Wiley. The state's experts didn't interview any of the people who knew Mr. Brumfield during his developmental phase. Not only is that required by the guidelines, by the AAIDD 10th, which is what Louisiana follows, along with the DSM, which were relied on by the Louisiana Supreme Court and the Supreme Court of the United States. Not only did they not follow those guidelines, but they didn't have the, because they didn't follow those guidelines, because they didn't speak with those people, they couldn't rebut the evidence that Mr. Brumfield couldn't follow simple direction, couldn't follow simple instruction. The school, the educators? They didn't interview the educators or the doctors? They didn't interview any of Mr. Brumfield's teachers. Both of Mr. Brumfield's experts interviewed his teachers, his fourth and fifth grade teachers. These are the people who referred him to be appraised and who testified that the reason they remember Kevin Brumfield out of the thousands of students they taught was because if any student they taught ever needed special attention, it was Kevin Brumfield. That's in the record, Your Honors. They didn't interview those, the state's experts didn't interview those teachers, didn't interview his coach. I actually very much encourage you, Your Honors, to look at volume, it's volume four of the record from pages 99 to about 110, I believe it is. That's right. In which the state's expert says, I told this counsel for the state that it would be very important for me to interview these people. And counsel for Mr. Brumfield goes through and says, would it have been helpful to talk to the coach? Yes, that would have been very helpful. But I only had the records I have. And so what you have, and this is why I answered your question, is I really don't think it's possible to come to the other conclusion. You have the state's experts telling you, I can't give essentially a full opinion on this that's consistent with the standard of care required of me as a medical profession. Now, they did give the opinion, the limited opinion, that he's not intellectually disabled, but because they didn't follow the standard of care, I think it would have been a real problem for the district court to reject the evidence of Mr. Brumfield's experts who did follow the standard of care. Your Honor, I would like to talk about a few other of the limitations, because I think it really is important to understand how much evidence there was of limitations, and really the consistency in it. And I really do think that's what distinguishes this case, or makes this case easier than prior cases, is really the consistency. You have no dispute as to the IQ scores. You have many of the limitations I've mentioned before. In addition to his inability to follow instructions, you have testimony to his coach and his maternal grandmother, who worked at a group home for the intellectually disabled. Said that he couldn't follow simple rules of games as a child. And then all of this evidence, which comes from the school records, again, objective records, was confirmed by Dr. Weinstein when he applied objective neuropsychological testing to Mr. Brumfield, which placed Mr. Brumfield in the bottom 1% of the population. And this is in Dr. Weinstein's report, which was admitted at Plaintiff 16 was the exhibit number. What that test showed, and this is Dr. Weinstein's words, was that there was brain dysfunction, which inhibited his ability to understand the consequences of his actions, and caused him to have impulsive behavior. And that language really resonates and is really fundamental to actions itself. And in actions, the Supreme Court said that the reason that intellectually disabled persons cannot constitutionally be executed, and why it's cruel and unusual, is that they have diminished capacity and diminished ability to control their impulses and to understand the consequences of their action. And that's what you have there. And that, again, unrebutted by the state. The state's expert here testified that, yes, I see those results, and they do seem to indicate brain dysfunction, but I'm not qualified to run neuropsychological batteries. And so, again, you have undisputed evidence before the district court confirming that he has these limitations. What about the fact that he could drive a car, hold a job, be a drug dealer? I mean, aren't these things in the record, too? These show some level of ability to manage life's... I'm not saying that being a drug dealer is managing, but it shows some level of keeping up with things. Yeah, Your Honor... He was a successful robber. Yeah, Your Honor, I think I have two responses to that. The first, of course, is the standard of review here. So even if the state could point to evidence from which the district court could have reached some other inference or some other conclusion, that doesn't suffice to show that the district court was implausible. And that's clear. Secondly, and more fundamentally, putting aside the standard of review, I think it would be a real problem to do that. Now, the district court clearly recognized that... A real problem to do what? A real problem to conclude that Mr. Brumfield is not intellectually disabled simply based on the fact that he can drive a car. And let me go directly to the guidelines, which, again, the Louisiana Supreme Court has said we look to for these sorts of things. The AIDD 11th Manual says specifically that it's very important when diagnosing intellectual disability to dispel the incorrect stereotypes that intellectually disabled persons can't do complex tasks, that they can't get a driver's license, buy cars, drive cars, that they cannot support their families, and that they cannot acquire vocational skills necessary for independent living. Is Louisiana's standard in this regard different than Texas's standard? Your opposing counsel referred to Briseno earlier, but is Louisiana's standard different than Texas's, where it does look at day-to-day activities? Your Honor, it is very different than Texas's standard. Louisiana does not have a Briseno... Anything like that. So where you might look at driving a car and doing all those things, those would be the things that you might choose to look at. That's right, Your Honor. And the district court did look at... It was very clear that he was considering everything the state was putting before him, but did not find that it would be appropriate to rule out intellectual disability based on any of those things. And the evidence in the record, more importantly, said, consistent with these guidelines, that persons with intellectual disability can get licenses, can drive cars, and so you shouldn't consider those to be dispositive intellectual disability and to outweigh the limitations, the serious limitations that Mr. Brumfield... When you say they're not dispositive, but there are some evidence that goes the other way. Well, Your Honor, so the test for intellectual disability, for instance, does look to practical skills. And so sometimes those things can speak to practical skills, and I wouldn't say that they're off the table altogether, but what we're talking about here, the limitations that the district court found here have nothing to do with those sorts of things, with the limitations here, again, severely limited ability to read and write, plateaued academically across the board despite having individualized attention for years, couldn't follow simple rules, couldn't follow simple instructions, and then you have... He can't process information the way that most people can, and he's, again, in the bottom 1% of the population based on that neurological testing. And again, that's why I bring it back to the consistency in this case. There really is no outlier. It's not like, for instance, Wiley, in which this court didn't find clear error. In Wiley, you had IQ scores of 92, you had IQ scores of 80, and so there were some outliers that even then the court said, this is the clear error standard. It was... And I'm sorry, it was Rivera which had the IQ score of 92. I'm sorry. Wiley had IQ scores, I think, of above 80, but not 92. In Rivera, there were IQ scores of 92, and in Wiley, you had testimony that he was a skilled repairman. Here, there really are no outliers. And again, even when you go through IQ, you go through the substantial limitations. When you go to the risk factors, Your Honors, Mr. Brumfield has virtually all of them. There was testimony in this record that the most common cause of intellectual disability, or one of the most common causes of intellectual disability, are genetics. And there was evidence that Mr. Brumfield has intellectual disability on both sides of his family. A first cousin with severe to moderate intellectual disability and who's in a wheelchair as a result of it. And a first aunt and uncle on his maternal side who also have moderate intellectual disability. You have testimony that his mother took psychotropic medicine during her pregnancy. You have, when you go to the actual birth... Psychotropic medicine or drugs? It was Valium, I believe, was what she was taking. And that was six months into her pregnancy. She didn't know that she was pregnant. You have fetal trauma at birth, born with a very low birth weight. And again, it's the consistency of this that really matters. And then post-birth, you have him living in an extremely abusive household, very impoverished household. Again, all things that the diagnostic manuals tell you to look for. And here, they're pleasant in a plethora. And it's far from implausible for the district court to have seen that evidence and said, there really is nothing controverted here about any of this evidence. Well, what do you do? I mean, this is the standard deal. And that is, what do you do with the evidence of the event itself where the murder occurred and all the planning, et cetera, that went into that deal?  I have a few responses, Your Honor. The first is, it's very clear that the district court, just to be very clear, because there was some suggestion that the district court didn't consider the crime. It's very clear that the district court understood his mandate under Louisiana law to consider the crime. That's at 394 and 395, his opinion, and 400 to 401. So just to get that out of the way. Then I get, Your Honor, what I look at is that there are actually absolutely no facts here. And this was conceded by the state's experts, Your Honor. There are no facts as to what Mr. Brumfield's actual level of participation in the crime was, meaning being a leader or being a follower as the state advances. And the state's experts conceded that. And I can give you the page sites for that. It's at volume four of the trial transcript, 134 to 35, and then the other expert at volume six, page 124. The point being, Your Honor, is perhaps it's good to take a quick step back, which is, when you're diagnosing intellectual disability, what you're looking for is, is this the sort of person who needs support to participate in society? That's the language that's used throughout the manuals is, does this person need supports? And the bottom line here, Your Honor, is we don't know what supports Mr. Brumfield had in this crime. The state mentions that Mr. Brumfield was scoping the place out beforehand. But the evidence actually shows that he was there with his co-defendant scoping it out. And at all stages in this crime, his co-defendant was with him. And so, Your Honor, what we don't know is, and what the facts certainly do not show, is that Mr. Brumfield had any sort of leadership role in this crime. And that's what the district court judge, the district court found here. And the state really gives no basis for finding that finding to be clearly erroneous. And again, the state's own experts conceded that you can really only get to the leadership conclusion if you infer that he did everything and he was the one who was leading everything. That's not in the record. Your Honor, I would like to go to a couple other points that were raised by the state, just to clarify a few things in the record. The state mentioned many times saying that the district court cut off the trial record. And there's some sort of issue here with respect to the evidence that was allowed or disallowed. Your Honor, that's absolutely not true. First of all, we're really still unsure what evidence the state's talking about. Nowhere in their brief do they cite to a specific piece of evidence that they say should have been- Referred to the prison witnesses who were not allowed to testify. Yeah. So Your Honor, let me tell you exactly what was and what was not admitted here. So first of all, at ECF 85 of the record, you'll see where the district court handles pretty much all of the pretrial motions to exclude. And you'll in fact see that he denied virtually all of Mr. Brumfield's attempts to exclude evidence. There were very select few pieces of evidence that were- The magistrate judge or Judge Brady? I believe it was the district court judge. I believe it was Judge Brady. Wasn't a recommendation from the magistrate judge? No, I believe it was Judge Brady himself. And then he actually revisited a few of the times when he denied certain pieces of evidence to the state. He then revisited and allowed it into the trial record based on his- He had basically just given a preliminary ruling. The pieces of evidence that weren't allowed in, one, the coroner's testimony from trial in which the coroner testified about the cause of the victim's death, the autopsy. What Judge Brady- Let me group that with another one. The second one was a forensic scientist who testified at the trial about the bullets and casings used in the crime. Now the state said that that evidence should be admitted because it shows that Mr. Brumfield is capable of firing a firearm. What Judge Brady said, and I think correctly, and certainly the state hasn't given any sort of reason to believe this is an abuse of discretion, said that has nothing to do with whether Mr. Brumfield is or is not intellectually disabled, which is the issue that was before the court. And the state's given no reason to believe that that's an abuse of discretion. And beyond that, Your Honor, to show that it was an abuse of discretion, the state would also have to show, beyond that, that it was material. And here, there was no dispute that Mr. Brumfield had fired a gun. The testimony in the record was that any nine-year-old could fire a gun. Dr. Greenspan specifically testified to that. And so it really has no bearing or no relevance. Even with limited motor skills? Well, Your Honor, the motor skills- Is it only fine motor skills and guns not fine? I mean, I don't know. I'm just asking. Well, Your Honor, as to the limited motor skills when he's writing, his ability to write in a straight line, that, again, was undisputed evidence. The state never contested it. And the testimony actually came not only from the evaluations by Mr. Brumfield's experts. Mr. Brumfield's fourth-grade teacher recalled that since the fourth grade, in order to write in a straight line, he's needed a piece of cardboard, and because of that, the limitation in motor skills. And so there's never been a dispute as to that fact. Why isn't the fact that he can use idioms and make quotes, famous quotes, why isn't that counter to the fourth-grade level and barely can identify words? Your Honor, there are a couple reasons for that. The first and probably most important reason is actually something that both experts for the state said. And you'll notice that when the state in its brief goes to the verbal behavior, starts quoting the phone calls, there's not a single site there to any expert testimony when it starts doing that. And the reason is that the state's experts wouldn't even go there. During the direct of Dr. Hoppe, which was one of the state's witnesses, Dr. Hoppe interrupted counsel for the state and said, I just want to correct something you just said, which is that I want to make very clear that persons with intellectual disability can have very good verbal skills. And so we don't look to that to determine whether someone has intellectual disability. And the state's second expert, Dr. Blanche, said the same thing. He said, I agree with the guidelines. The guidelines say you don't look to verbal behavior. And the reason is that even persons with intellectual disability can have fluency in the way they speak by the time they're adolescents. And so you really can't tell the difference between someone who's intellectually disabled and someone who's not by looking at verbal behavior. So that's the most fundamental answer, Your Honor. There was also testimony in the record that Mr. Brumfield frequently parrots things he's heard when he's in those sorts of conversations. And that was actually the only expert testimony on those specific facts that Your Honor just raised. But getting back to the cutting off the trial record, I'll just say the only other evidence that was cut off, sorry, that was not admitted, there were two more. One was the testimony of Sue Bernard, which was a witness at trial who saw Mr. Brumfield the day before the crime. Again, that fact was not disputed by Mr. Brumfield. And the district court clearly did know about it, contrary to the state's suggestion, because he refers to it in his own opinion and says, I don't think that that in any way cuts against intellectual disability. Again, not disputed. And that was consistent with the expert testimony that was in the record here. OK, I'm still confused. And I'm sorry, you just have to help me. I've had a bunch of arguments today. But this is very important, obviously. The opposing counsel says Judge Brady repeatedly refused to admit the trial court record into evidence. So if I were to go to the record and want to study the record in detail, I want to continue to make sure I'm double checking things. Would I see an exhibit that the trial court record was offered and then refused? Or would I see an exhibit that it was offered and admitted? Your Honor, the entire trial court was lodged with the district court. Now, as with any other trial, in order to admit evidence, the state had to show relevance. And so what I'm saying now is that the entire penalty phase record, which is where you had some testimony about Mr. Brumfield himself, was admitted. With the exception of the testimony of Dr. Bolter. And the only reason is that Dr. Bolter testified again at the federal hearing. Dr. Bolter's report from the trial was admitted. So there were selected parts not admitted, but other parts were admitted. That's right. And the only three parts of the trial record that were not admitted, again, the coroner, the forensics expert, and Sue Bernard, who saw Mr. Brumfield at the store the day before. Those are the only parts we're aware of. And again, the state doesn't point to what they're talking about there, to be honest, Your Honor. So we don't know for sure. But those are the only three pieces of evidence we're aware of that were not admitted. And so— At the mitigation phase of the trial, was mental retardation offered or argued? Your Honor, there was no issue of intellectual disability at the time because it was pre-Atkins. There was some testimony, for instance, about an IQ score as the— Well, in mitigation, it wouldn't have to be totally dependent on Atkins. It would be an argument in mitigation. Well, Your Honor, so Mr. Brumfield never sought to mitigate on the basis of intellectual disability, and that was for the reasons, at the time, Penry was governing, which really recognized that offering that sort of evidence can be very much— It can go either way. It can go either way. So no, he never sought to prove his intellectual disability, whether for mitigation or for Atkins. I only say that there was some evidence of his mental state and— sorry, his mental capacity, which is what the Supreme Court looked at in this case. And, Your Honor, I think it's worth looking at how extraordinary it is what the state is asking this court to do in this current posture. The Supreme Court looked, and I agree with the state, it looked at the state record only. It looked at the pre-Atkins trial phase record. Primarily, we're talking about the mitigation, the penalty phase evidence. Okay, but what about the regular trial? Was that introduced and offered and refused? Your Honor, again, so the testimony I'm referring to about the coroner, the forensics expert, and Superintendent, were all from the trial itself. Okay, but the opposing counsel— I mean, your ship's passing in the night on this. Opposing counsel, page 46 of the brief says that the court refused to admit the trial record, and if the trial record had gotten in, then the court, they would know that Brumfield kept the larger caliber gun for himself and gave the smaller gun to his co-defendant, that he would ride around town looking for places to commit crimes, et cetera. And so they're saying that the court did not admit the information, and you're saying it admitted all but just tiny bits of it. And so I'm confused. Your Honor, what I'm saying is that that's actually demonstrably false. The trial court, as I say, admitted all of it except for what I mentioned. Those facts that the State's referring to come from Mr. Brumfield's confession, and the confession was played in open court. Judge Brady, the district court, listened to that. Experts testified on that and said what he mentioned in that confession tape, all of the things he mentions doing are entirely consistent with intellectual disability. But it was said in the State record. Sorry, say again? If he testified to it in his confession or his statement, was that information also in the State record? Because opposing counsel seems to be indicating that that was not allowed. It was not admitted. The confession was in the State record, and it was admitted. And, Your Honor, I can point you to two documents that answer this question very easily. One is ECF 85 of the district courts, which handles virtually all of the motions to exclude and admits virtually all of the evidence the State seeks to admit. The second is document 110 of the district court's docket, which is the exhibit and witness list. And you can just see the list of virtually every person who test— trial testimony of John Lewis admitted, trial testimony of Anthony Miller admitted, trial testimony of Edna Parrott. Virtually everything was admitted, again, with the exception of the coroner, the firearms expert, and the testimony of Sue Bernard. And so that's just plainly false, Your Honor, and it's not a basis for reversal to the extent it was even properly before this court based on how it was briefed. So you're saying the Supreme Court looked at the State trial record only. I mean, part of the situation here is that some of them sent a very clear message that if they were going to look at this, they would find that he was— he wasn't intellectually disabled. And where does that come from? This is part of the message from the State's brief, Your Honor, that you're referring to? Yeah. So, Your Honor, just to be very clear, what the Supreme Court decided in this case, it looked at the State trial record and it said, the evidence in the State trial record provided, quote, substantial reason to believe that Mr. Brumfield is intellectually disabled, that he has a substantial limitation in adaptive skills. Substantial reason and substantial grounds were two quotes from the Supreme Court's opinion. What the State now points to is not the Supreme Court opinion, which it never once cited. What the State points to is Justice Breyer's comment during oral argument. That's the only thing the State points to. Now, putting aside the propriety of pointing to a question at oral argument, if you look at the context of Justice Breyer's comment, it's very clear that what he's saying there, he's gone through a long exchange to try to clarify what is the issue before this court. Is it whether the State court record necessarily proved that he was intellectually disabled, even though that wasn't an issue at the State court? Or was it that the State court record showed that he was entitled to a hearing? And so Justice Breyer says, counsel for the State, I'm overstating this. But what I'm trying to say is, if it is that he needs a hearing, then you lose because there was a lot of evidence in there that would entitle him a hearing. If it is that the State court record alone, which intellectually disability never came up, had to show that he is in fact intellectually disabled. And again, we're under the deferential EDPA standard. If that's the case, maybe you win.  All of that evidence that was in the State court record, which the Supreme Court again said, and this is Justice Breyer joining this opinion, saying it gives substantial reason to believe he's intellectually disabled. You have all of that evidence before the District Court, all of it, with the exception of evidence that the autopsy, sorry, the coroner and the forensic expert, which was irrelevant to the Supreme Court's opinion. It was never raised at all in that opinion. So you have all of the evidence that's relevant before the District Court. And then you have seven days of expert testimony. You have two or three experts, two experts testifying in court that Mr. Brumfield is intellectually disabled, and a third report expressing the opinion he's intellectually disabled. You have all of the objective evidence, medical records, school records. None of that was in what the Supreme Court was looking at. You have medical records, school records. You have the interviews of 14 persons who knew Mr. Brumfield, none of whom believed he was on par with his peers. And again, the various limitations I mentioned. All of that was added after the Supreme Court's hearing. And so that's why I say this is extraordinary, because what the state is telling this court is that even though the Supreme Court said that the pre-Atkins record alone provided, quote, substantial reason to believe he's intellectually disabled, and after there was seven days of evidence of limitations, the District Court's finding is implausible. That doesn't add up, Your Honor. And to do so would be, to reach that conclusion, as the state asks this court to do, would be quite an extraordinary thing. Opposing counsel began with footnote 8 of a prior opinion of this court. Yeah. Your Honor, I see my time is out. May I? You may answer the question. Your Honor, I wouldn't presume to speak for this court, but in footnote 8, this court did say that it would likely find that Mr. Brumfield was not intellectually disabled. Your Honor, what was very clear about the court's opinion was that it was resolving the case on the basis of AEDPA and not on that basis. And the court could have, but did not go that route. What we have now, again, Your Honor, is the Supreme Court's opinion telling this court that there was substantial reason in the state court record alone to find that Mr. Brumfield is intellectually disabled. And if you read Dunn, a fair-minded reading of Dunn, I believe, Your Honor, says that deference to the finder of fact in these sorts of exceedingly factual determinations of adaptive skills is really the touchstone of intellectual disability. And again, I think that's also reflected in this court's opinions in Wiley, Rivera, and Moore. All right. Thank you, Mr. Alley. We have the argument. All right. Ms. Burns, you have some rebuttal time. May it please the court, I would like to first clarify the issue of the introduction and the attempts repeatedly on three separate occasions to introduce the entirety of the trial court record. That was refused. And if the court will look at the very last remarks that I made, I once again, as a last-ditch effort, tried to offer it to the court. The court denied it and said, only if you and Mr. Trent Acosta, trial counsel, can get together and agree upon those portions, then you agree upon them. He absolutely refused. What explicit portions were excluded? Truly everything was. What I attempted to do when— That's not what opposing counsel is saying. And I disagree with that. What I would— Tell me what was excluded. When I offered to put it in, he denied it. And so what I tried to do at certain points was to parcel little pieces out and say, I need the testimony of Cassandra Holmes, who will show the motive in this case. Pregnant girlfriend, needing money. He tells her, I'm going to go out tonight. I'll get $1,000 for you, which shows not only—it shows the motive. It shows that he was the ringleader. That was excluded? That was excluded. So it's not just the coroner's report and— No, it's not. Sue Bernard's testimony was excluded. And I might add that counsel at the district court hearing for Mr. Brumfield, Mr. Trent Acosta, said—and when the court asked me, why do you want it? I said, he was in there 77 minutes before the crime to see Betty Smothers in her uniform working and see that there was a female clerk. Mr. Trent Acosta's response, and it's in the record, is that he was never in the store that when there was clearly this witness to show that he and Broadway were in the store. The testimony of Veda Jones, who was the manager of that store, who would have testified, this Piggly Wiggly that was robbed was only one of—there were six stores in the system. This was the only store in the system that banked at this particular bank, far away from where both Broadway, Brumfield, and the driver lived. And it required scoping driving there, which I did play. I did play the two confession tapes during the course of the district court hearing. And that clearly showed when Mr. Brumfield was initially asked, he said, oh, I was the driver of the car. I parked and I kept my blinkers on, on the car. So those were admitted, correct? That was admitted, yes, it was, Your Honor. Let's talk about what isn't—what was excluded. And then Veda Jones's testimony, which would have showed the complexity of having to scope out this particular store, find it, find out where it banked, when it banked. And Mr. Brumfield, in his confession, even admits that I ride around at night. He admitted that he was the leader. He was—he was—he had gone to John Lewis. He had gone to Eddie Paul. Eddie Paul's testimony— But that was admitted. John Lewis was admitted. The testimony of Eddie Paul also showed that he had come approximately a week before and said he was going to commit— We're talking about what was excluded. You keep getting— Initially, what was excluded as well was the—and I don't know what weight was ever given. The testimony of the two prior victims—three prior victims. The victim, Anthony Miller, who had been robbed December the 25th, was excluded. He said that has no relevance. And the testimony of Trina Perkins and her mother, Edna Perry, was also excluded. And this was relevant because even their own expert, Dr. Greenspan, said it is unlikely that someone who suffers from intellectual disability would be able to perpetuate within a two-week period a span of very successful armed robberies in which he had a leadership position. Okay. Opposing counsel says it is in the evidence that—about the gun size and that Brumfeld kept a larger caliber gun for himself. That was not. That was not. And I tried— That is not in evidence. Opposing counsel says it is. I mean, this is extraordinary to have very competent counsel to say such diverse things. I tried to—when I played—before I played the tapes with the detective who took the confessions from him, I tried to elicit the fact that there were two guns. There were two different calibers. Judge Brady cut me off and said that I don't see the relevance in any of this. My whole point— Who were you questioning? Jerry Callahan, the detective who elicited the two. And to me— But was that already in evidence because the confession was in evidence? The—no, it was not. At that point, I had not been able to play the tapes. I was laying a predicate. But did you get to play the tapes? And so this did actually come before Judge Brady. I played the tapes. What—well, and in the tapes, Mr. Brumfield very clearly states, I scoped it out. I rode around at night. I had followed them once before. I, I, not myself. So the jury heard that? The jury, yes, indeed. The jury heard that. It wasn't excluded. So let's not talk about that. No, it was not excluded. The judge would have heard that, but the jury obviously heard that during the trial itself. Additionally, what I'd like to also go into is the fact that this man who supposedly, according to Weinstein, couldn't lace his shoes, couldn't follow simple orders, was basically, what I would suggest to this Court, represented in his report as almost like a person of idiotic norms. This person had had three legitimate jobs that he ultimately quit. It is in the record that he chose to drug deal because it was more productive and financially to him. Who said idiotic norms? Is that your characterization? It is because Dr.— Is that one of the things that the experts are using? Dr., Dr., well, in, in the jurisprudence, going back to Penry, that's, that's what Justice Stevens talked about. He was like, you know, we go back to the old village idiot standard. And the way Dr. Weinstein wrote that report, it was as if to say this man cannot even lace his shoes. When I questioned him, because everybody said he certainly could lace his shoes, he said, well, you know, he can't do it fashionably. And when I asked him, could he work, well, I don't consider illegal employment. Various things like that. You know, this wasn't important. Oh, he had never entered into a contract. This is a 20-year-old person. And yes, he did rent cars, street rental cars. He had rented hotel rooms the night of the crime. Back and forth. That's in the record. It's all in the record. Thank you. We have your argument. You're out of time. Thank you very much. Thank you. All right.